USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/30/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES

-v-

JUGO CESPEDES, MANUEL GERALDO, and
HARGELIS VARGAS,

                           Defendants.

------------------------------------------------------------------X

11 Cr. 1032 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

In December 2014 and April 2015, defendants Jugo Cespedes, Manuel Geraldo, and Hargelis Vargas (collectively, the "defendants") each pled guilty to one count of conspiracy to commit racketeering. The racketeering acts admitted in the course of the pleas included, *inter alia*, participation in the March 19, 2010 murder of Orlando Salgado. The parties disputed, however, whether that murder qualified as a first-degree or second-degree murder. To resolve that dispute, on July 13, 2015, the Court held a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979). For the following reasons, the Court finds that the attack on Salgado, although it presents a close question, is more accurately characterized as second-degree murder.

I. **Factual Findings**

Many relevant facts are contained in a common stipulation that the Government and each defendant agreed to at the time of the guilty pleas. *See* Stipulation ("Stip."). The remaining evidence adduced at the *Fatico* hearing consisted of the live testimony of Officer Anthony Disapio, Raymond Sosa, and Anderson Abreu; the stipulated testimony of Nathaniel Flores and

Detective Daniel McCrosson[1]; and exhibits including several photographs and a medical report. *See* Dkt. 1751 ("Tr."); McCrosson Stipulation ("McCrosson Stip."). Based on a preponderance of that evidence, the Court finds the following facts.

During the day of March 19, 2010, Raymond Hernandez, a member of the Latin Kings gang, got into a fight with "Individual 1," a member of the Bronx Trinitarios gang. McCrosson Stip. ¶¶ 4(a)–(b). The fight occurred in the vicinity of East 197th Street and Webster Avenue in the Bronx. *Id.* ¶ 4(a).

That night, members of the Trinitarios gang held a meeting near the intersection of 164th Street and Sheridan Avenue in the Bronx. Stip.; Tr. 51 (Sosa); Tr. 131 (Abreu). After the meeting, several gang members had gathered in front of a grocery store when Individual 1 and Vargas pulled up in a minivan. Stip.; Tr. 51–52 (Sosa); Tr. 131–32 (Abreu). Vargas informed the Trinitarios that a rival gang member had tried to attack him, and asked for help retaliating. Stip.; Tr. 52–53 (Sosa); Tr. 132 (Abreu); Tr. 173 (Flores). Abreu, Cespedes, Flores, Geraldo, and Sosa agreed to help Vargas, and Individual 1 drove the group to the vicinity of East 197th

---

[1] The McCrosson Stipulation recounts statements a third party made to Detective McCrosson. In sentencing proceedings, the Court may consider all "relevant information," including hearsay statements, "without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability." U.S.S.G. § 6A1.3; *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) (Sotomayor, J.) ("Both the Supreme Court and this Court, however, have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."); *Hill v. Sciarrotta*, 140 F.3d 210, 215 (2d Cir. 1998) ("[H]earsay information may unquestionably be used in the discretion of a sentencing judge and given such weight as appears in his discretion to be merited."). The Court finds that the hearsay statements in the McCrosson Stipulation are sufficiently reliable to merit consideration because they were made soon after the murder occurred, are inculpatory insofar as they admit that the declarant was a member of the Latin Kings gang and had gotten into a fight earlier in the day, and are consistent with the other evidence presented at the *Fatico* hearing. *See, e.g., United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989). In any event, although the McCrosson Stipulation provided helpful context, it was not significant to the Court in reaching its conclusion.

Street and Webster Avenue, farther north in the Bronx. Stip.; Tr. 54 (Sosa); Tr. 133, 137 (Abreu). As Sosa and Abreu testified, they agreed to help Vargas because of the Trinitarios rule that "when a Trinitario bleeds, we all bleed." Tr. 54 (Sosa); Tr. 134 (Abreu). Additionally, those gang members had recently formed their own "chapter" or "set" of the gang and were eager to develop a reputation as ruthless, violent, and tough. Tr. 54, 68–69, 115–16 (Sosa); Tr. 137, 160–62 (Abreu).

Although Sosa and others had access to guns stashed near 164th and Sheridan, Tr. 82–85 (Sosa), the group did not retrieve any weapons before they got into the van, Tr. 53–54 (Sosa); Tr. 133 (Abreu). Rather, some of the men already had knives in their possession, and others armed themselves with tools they found on the floor of the van. Stip.; Tr. 55, 108 (Sosa); Tr. 136, 171 (Abreu). By the time they arrived at 197th and Webster, Geraldo and Cespedes had knives; Abreu had a hammer; and Flores had a metal pipe. Tr. 56–57 (Sosa); Tr. 136 (Abreu). During the 10–20 minute ride, Tr. 55, 116 (Sosa), 137 (Abreu), the group discussed "who exactly the problem was with" and affirmed that "whoever [they] found, [they were] going to take care of it," Tr. 55 (Sosa). Everyone in the van was "hyped." Tr. 116 (Sosa).

At 197th and Webster, everyone other than Individual 1 exited the van and began to search the area on foot. Stip.; Tr. 137–38 (Abreu). Roughly 10–15 minutes later, Vargas identified a man on the street as the rival gang member who had tried to attack him. Stip.; Tr. 56 (Sosa); Tr. 137–38 (Abreu). At that time, the rival gang member, Hernandez, was walking with Salgado. McCrossen Stip. ¶ 4(c). Hernandez was able to run away, and the Trinitarios set upon Salgado. Stip.; Tr. 58 (Sosa); Tr. 139 (Abreu).

In the course of the attack, Abreu hit Salgado three or four times in the head with a hammer, causing him to drop to the ground; Flores hit Salgado with a metal pipe; and Cespedes

3

and Geraldo stabbed Salgado. Stip.; Tr. 58–59, 91 (Sosa); Tr. 139–40 (Abreu); Tr. 173 (Flores). The attack was "fast" because Salgado was "knocked out," and "the police were coming." Tr. 60 (Sosa); *see also* Tr. 141 (Abreu).

After attacking Salgado, the Trinitarios returned to the van, and Individual 1 drove them to the vicinity of Fordham University. Stip.; Tr. 61, 64 (Sosa); Tr. 140–41 (Abreu). Someone made a remark to the effect of "damn . . . we killed him." Tr. 64 (Sosa). From Fordham Plaza, the gang members continued their flight on foot or in cabs. Stip.; Tr. 64–66 (Sosa); Tr. 141 (Abreu). During the escape, Cespedes threw the knife he had used to stab Salgado onto the Metro North train tracks. Stip.; Tr. 65 (Sosa); Tr. 141 (Abreu). The gang members later reconvened at 164th and Sheridan, where the group discussed the attack, and Geraldo "bragg[ed]" that he "had stabbed a guy to death." Tr. 66 (Sosa); *see also* Tr. 142, 158 (Abreu).

The next day, the gang learned from the local news that Salgado had died. Tr. 67 (Sosa); Tr. 142–43 (Abreu). The medical examiner later concluded that Salgado had sustained blunt force injuries on his head and had died as a result of multiple stab wounds. Stip.

## II.  Applicable Legal Standards

The Indictment charges the Salgado murder as a violation of New York Penal Law § 125.25, murder in the second degree. *See* Dkt. 539 ("S5 Indictment"), at ¶ 100. For purposes of calculating the sentencing guidelines, however, the Court must identify "the most analogous federal offense." U.S.S.G. § 2E1.1, Application Note 2; *see also United States v. Minicone*, 960 F.2d 1099, 1110 (2d Cir. 1992) ("Although New York law would have categorized the murder of [the victim] only as second degree murder, the task of the district court was to find the offense level corresponding to the most analogous federal offense.").

The Federal Criminal Code defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). First-degree murder is "murder perpetrated by poison [or] lying in wait," murder "committed in the perpetration of, or attempt to perpetrate" certain enumerated offenses, or "any other kind of willful, deliberate, malicious, and premeditated killing." *Id.* "Any other murder is murder in the second degree." *Id.*

Here, the salient distinction between first- and second-degree murder "is the requisite mens rea." *United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000). First-degree murder requires both malice aforethought and premeditation, "the specific intent to commit an unlawful killing." *Id.* (citation omitted); *see also United States v. Delaney*, 717 F.3d 553, 556 (7th Cir. 2013) ("The only difference between the two degrees of murder, sharing as they do the requirement that the murderer have acted with 'malice aforethought,' is . . . that a first-degree murder . . . must be 'premeditated.'"); *United States v. Begay*, 673 F.3d 1038, 1042 (9th Cir. 2011) ("[P]remeditation is the essential element that distinguishes first-degree and second-degree murder."); *United States v. Shaw*, 701 F.2d 367, 392 (5th Cir. 1983) (cited favorably in *Mulder*, 273 F.3d at 117) ("Section 1111 retains a common law distinction between second degree murder, which requires a killing with malice aforethought, and first degree murder, which in addition to malice aforethought requires a killing with premeditation and deliberation.").[2]

Premeditation "requires a 'cool mind' that is capable of reflection" and "some appreciable time for reflection and consideration before execution of the act." *Shaw*, 701 F.2d at 393; *see also Delaney*, 717 F.3d at 556 ("[P]remeditation requires that 'an *appreciable* time elapse between formation of the design and the fatal act within which there is, in fact,

---

[2] As the Second Circuit noted in *United States v. Mulder*, 273 F.3d 91 (2d Cir. 2001), there is "no precedent from this circuit that defines premeditated or first degree murder," but "cases from other circuits give some guidance." *Id.* at 117.

5

deliberation.'") (quoting *Fisher v. United States*, 328 U.S. 463, 469 n.3 (1946)). However, "no particular period of time is necessary for such deliberation and premeditation." *Shaw*, 701 F.2d at 392. Premeditation "does not require the lapse of days or hours, or even minutes." *United States v. Brown*, 518 F.2d 821, 826 (7th Cir. 1975) (cited favorably in *Mulder*, 273 F.3d at 117) (quoting *Bostic v. United States*, 94 F.2d 636 (D.C. Cir. 1937)). Rather, "it is the fact of deliberation, of second thought[,] that is important." *United States v. Catalan-Roman*, 585 F.3d 453, 474 (1st Cir. 2009) (citation omitted) (alteration in original).

"Premeditation can be proved by circumstantial evidence." *Begay*, 673 F.3d at 1043; *see also Brown*, 518 F.2d at 826. Relevant circumstantial evidence includes:

> (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

*United States v. Blue Thunder*, 604 F.2d 550, 553 (8th Cir. 1979) (quoting W. LaFave & A. Scott, Jr., Criminal Law § 73 at p. 564 (1972)) (emphasis omitted); *see also United States v. Davis*, 531 F. App'x 601, 607 (6th Cir. 2013) (unpublished opinion); *Begay*, 673 F.3d at 1043; *United States v. Dale*, 614 F.3d 942, 963 (8th Cir. 2010).

"Second-degree murder, by contrast, is a general intent crime that requires only malice aforethought." *Wood*, 207 F.3d at 1228 (citation omitted). "[S]econd degree murder's malice aforethought element is satisfied by: (1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent-to-do-serious-bodily-injury; [or] (3) depraved-heart." *United States v. Regnier*, 44 F. App'x 524, 529 (2d Cir. 2002) (summary order) (quoting *United States v. Pearson*, 159 F.3d 480, 486 (10th Cir. 1998)); *see also id.* at 527–28 (affirming a

6

finding of malice aforethought where defendants "intended to beat [the victim] mercilessly" and "administer[] serious injuries"); *United States v. Velazquez*, 246 F.3d 204, 214 (2d Cir. 2001) ("[T]he requisite malice can in some circumstances be found when the assailant acts with awareness of 'a serious risk of death or serious bodily harm.'") (quoting *United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994)) (emphasis omitted).

### III. Discussion

The parties agree that the murder of Orlando Salgado arose out of a premeditated attack. And the evidence compels that conclusion: The defendants decided to retaliate against a rival gang member for attempting to attack Vargas, spent 10–20 minutes driving to a different part of the Bronx, armed themselves with knives and tools they found in the vehicle, and searched for the rival gang member on foot for 10–15 minutes before launching their attack. The more difficult question is whether the evidence adduced at the *Fatico* hearing is sufficient to establish premeditated *murder*. This question is a close one. For the following reasons, the Court finds, narrowly, that the facts are more consistent with second-degree than first-degree murder.

At the *Fatico* hearing, two gang members involved in the attack testified credibly about their intent, but their testimony was inconclusive. Sosa testified that he was indifferent as to whether the retaliatory attack would entail a murder or a non-fatal assault:

> We were going to find whoever was responsible for attacking our member, and we were just going to go take care of it; we were going to retaliate. . . . We were just going to find the person, and at any means we were just going to take care of the situation, be it a beat-down or a gang assault, murder, whatever. He attacked one of us, so now it's our turn to attack them.

Tr. 54–55; *see also* Tr. 114 ("I thought it was going to end up in any way, it didn't matter."). When pressed, Sosa eventually stated that "once [he] saw the tools," he "knew this guy wasn't going to survive" and that the gang members were "going to kill him," Tr. 114–15, but his

testimony did not establish that Sosa's subjective intentions were shared by others in the group. Indeed, according to Sosa, the only conversation among the gang members was "hype" to the effect that they were going to "take care of" or "take down" the rival gang member. Tr. 115–16. There is, therefore, no convincing basis for imputing Sosa's intent to kill to Cespedes, Geraldo, or Vargas.

Abreu, similarly, testified as to his own subjective intentions:

Q. What did you expect to happen after you got into the van?
A. When we got [into the van], my expectations wasn't to go there and take somebody's life away, but as I grabbed the hammer, as [Cespedes] and [Geraldo] had knives, and [Flores] had a pipe, we was really going to hurt somebody that night. And me personally, since we was a new chapter, I wanted to build a name for myself so people could think I'm a tough guy, because at the moment that's all I used to care about.

Tr. 137; *see also* Tr. 166 ("When I got the hammer, I wanted to kill somebody. I wanted to hurt somebody real bad."). According to Abreu, his intent to kill emerged when he found the hammer and decided to arm himself with it. None of the other gang members who attacked Salgado had that experience: Cespedes carried a knife that he apparently regularly carried on his person, *see* Tr. 54, 108; Geraldo carried a knife that Flores had given him, Tr. 136; and Vargas was unarmed, *see* Tr. 56–57, 136. Further, Abreu could not recall any discussion that would have alerted the other gang members to his murderous intentions. Tr. 137.

Because the direct evidence does not clearly resolve whether the gang members intended in advance to kill Salgado, the Court turns to the circumstantial evidence. *See Begay*, 673 F.3d at 1043. This evidence is, the Court finds, more consistent with an intent to assault than an intent to kill.

As noted, it is beyond dispute that the gang members planned an attack. Notably, however, they declined to retrieve the firearms they had stashed in the vicinity of 164th and

Sheridan. Tr. 82–85. Instead, they armed themselves with knives they regularly carried, *see* Tr. 54, 108, and tools they happened to find in the van, Tr. 54, 136, 171. In hindsight, a fight between six men with four dangerous weapons and one unarmed man appears destined to end in death. But at the time the defendants entered the van, a vehicle they had never been in before, they had no way of knowing what weapons, if any, they would find there. Tr. 83, 86 (Sosa). And when they exited the van to search for their target, the defendants had no way of knowing how many rival gang members they would encounter. Indeed, Sosa testified that Vargas reported that he had been "jumped" by "some guys," at one point describing the altercation as "a whole block thing." Tr. 52–53. Further, Abreu explained that he grabbed the hammer from the van because he thought there would be "a lot of guys" on Webster Avenue. Tr. 152, 164. In light of these facts, the planning activity, although plainly indicative of a premeditated attack, does not support an inference of premeditated murder.

Additionally, "the nature of the killing," although brutal, was not "so particular and exacting that the defendant must have intentionally killed according to a preconceived design." *Blue Thunder*, 604 F.2d at 553. The attack was an uncoordinated melee—Vargas spotted the person who had "jumped" him earlier, and the Trinitarios members ran toward Hernandez and Salgado, hitting whomever they could reach in whatever manner possible. The attack was also extremely brief; Sosa described it as lasting a "couple of seconds," Tr. 60, 91, and Abreu couldn't say what happened after he hit Salgado with the hammer "because it all happened so quick," Tr. 140. Finally, when the gang members fled, Salgado was still alive and possibly still conscious. *See* Tr. 29–32 (Disapio); Tr. 152 (Abreu).

The facts of the Salgado assault are therefore consistent with retaliatory non-fatal assaults that the participating Trinitarios members had previously committed. In those instances, the

9

Trinitarios members had attacked rival gang members with bare hands, "bottles," and "canes," which "could kill somebody." Tr. 169 (Abreu). Significantly, before the Salgado murder, the majority of retaliatory attacks had not resulted in death. *See* Tr. 115–17 (Sosa) (testifying that, before the Salgado murder, he had participated in multiple non-fatal assaults but was aware of only one murder committed by Trinitarios members); Tr. 169 (Abreu) ("There was plenty of times we had brawls and we would just fight with the guys and that's about it.").

To distinguish the attack on Salgado from non-fatal attacks committed by the Trinitarios, the Government relies on the participants' motives: to retaliate against the rival gang member who had attempted to assault Vargas, and to enhance the reputation of the new Trinitarios chapter. But neither of these motivations required a fatal assault. As Sosa testified, a retaliatory attack could be "a beat-down or a gang assault," Tr. 55, and as of March 2010, the Trinitarios had committed various non-fatal retaliatory attacks but only one murder, Tr. 115–17. And inasmuch as Vargas had not been harmed, *see* Tr. 85, the Trinitarios' "blood for blood" rule did not necessarily require a fatal attack, *see* Tr. 45. Similarly, while a murder might have a greater impact on the gang's reputation than a non-fatal assault, both types of attacks enhanced the gang's reputation. *See* Tr. 160–63 (Abreu). That the Salgado murder had the effect of inspiring fear and respect for the new Trinitarios chapter, *see* Tr. 69 (Sosa), does not support an inference that Cespedes, Geraldo, and Vargas set out to kill.

On the record before the Court, the Court cannot find that, prior to arriving on the scene and jumping Salgado, the defendants had "the specific intent to commit an unlawful killing." *Wood*, 207 F.3d at 1228. Rather, the defendants' intent is best described as "inten[t] to beat [the victim] mercilessly" and "to do serious bodily injury." *Regnier*, 44 F. App'x at 527–28. The

10

Salgado murder therefore qualifies as a second-degree murder within the meaning of 18 U.S.C. § 1111. *Id.* at 528 (citing *Pearson*, 159 F.3d at 486).

The Court's finding that the Salgado murder was a second-degree murder will set each defendant's applicable guidelines range approximately one-third lower than had it been found to be a first-degree murder.[3] The Court notes, however, that the murder falls close to the line between first and second degree. And the facts established at the *Fatico* hearing reflect extremely negatively on all three defendants awaiting sentencing. They reflect bloodthirstiness and savagery. These facts are highly relevant to several § 3553(a) factors, including "the nature and circumstances of the offense," "the need for the sentence imposed to reflect the seriousness of the offense," and the need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a). The Court is therefore seriously considering imposing an above-guideline sentence for the defendants involved in the Salgado murder. As such, the parties should carefully address the nature and circumstances of the murder and their relevance to the various § 3553(a) factors in their sentencing submissions.

## CONCLUSION

For the foregoing reasons, the Court holds that the Salgado murder qualifies as a second-degree murder. In preparing the Presentence Report, the Probation Department is respectfully directed to calculate the applicable guideline range accordingly.

---

[3] Specifically, the range for Jugo Cespedes will be 235–293 months rather than 360 months to life imprisonment; the range for Manuel Geraldo will be 210–262 months rather than 324–405 months; and the range for Hargelis Vargas will be 168–210 months rather than 292–365 months.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: July 30, 2015
      New York, New York